**John A. BURNS, Plaintiff, Appellant,**

v.

**STATE POLICE ASSOCIATION OF MASSACHUSETTS and Dean Bennett, Defendants, Appellees.**

No. 99–2299.

United States Court of Appeals,
First Circuit.

Heard Sept. 12, 2000.

Decided Oct. 24, 2000.

---

Harrison A. Fitch and Joel P. Suttenberg for appellant.

Brian Rogal with whom Timothy M. Burke was on brief for appellees.

Before SELYA, Circuit Judge,
COFFIN, Senior Circuit Judge, and
STAHL, Circuit Judge.

COFFIN, Senior Circuit Judge.

Plaintiff-appellant John Burns claims that the State Police Association of Massachusetts (SPAM) and one of its officers conspired to prevent his promotion to a higher rank in the state police force because of his race, in violation of 42 U.S.C. § 1985(3). Concluding that a conspiracy could not exist between a corporation and one of its officers acting in his official capacity, the district court granted summary judgment for defendants on the § 1985 claim and remanded related state law claims of defamation, slander and malicious prosecution to a Massachusetts court. We affirm, though on the more basic ground that appellant failed to present sufficient evidence of racial animus to support his § 1985 claim.

I. *Factual Background*

Our review of a grant of summary judgment is plenary, and we consider the facts and all reasonable inferences to be drawn from them in the light most favorable to the nonmovant. *F.D.I.C. v. Kooyomjian,* 220 F.3d 10, 13–14 (1st Cir. 2000). We need not accept the district courts reasoning, however, and may affirm the entry of summary judgment on any sufficient ground revealed by the record. *Torres v. E.I. Dupont De Nemours & Co.,* 219 F.3d 13, 18 (1st Cir.2000). The opposing party may not rely on conclusory allegations and unsupported speculation, and even when "elusive concepts" like motive or intent are at issue summary judgment may be appropriate. *Pagano v. Frank,* 983 F.2d 343, 347 (1st Cir.1993). The opposing party must offer "definite, competent evidence" to defeat a properly supported motion for summary judgment. *Torres,* 219 F.3d at 18 (citations omitted); *Pagano,* 983 F.2d at 347. With these standards in mind, we outline the pertinent facts.

Appellant Burns joined the Massachusetts State Police as a captain in 1992 when that force merged with several other Massachusetts police organizations, including his employer, the Metropolitan District Police (METS). In 1995, appellant was promoted to major, making him the highest ranking African–American officer in the State Police. On six subsequent occasions, however, he was passed over for promotion to colonel. He claims that his rise in the ranks was stalled by a racially motivated conspiracy between appellees

SPAM, the union representing state troopers and sergeants, and SPAMs vice president at the time, Dean Bennett.

To support his conspiracy theory, Burnss complaint alleges four instances in which he claims he was treated unfairly. The "First Incident," in early 1993, involved an accusation by an unknown person that Burns had a physical altercation with a trooper over unauthorized bumper stickers on the officers car. Although Burns did report the improper stickers, an investigation led to a determination that the allegations of a physical confrontation were false.

In the "Second Incident," which occurred later in 1993, Burns again was accused falsely by an unknown individual. On this occasion Burns was alleged to have fondled the breast of a female trooper while questioning her about a missing name tag. An investigation led to the conclusion that the entire scenario was fabricated.

The "Third Incident" arose from an inspection Burns conducted to assure compliance with a new procedure for troopers appearing in court. Troopers required to be in court to testify accounted for their time by obtaining court cards and having them signed. One day in November 1994, Burns spoke with Trooper Kathleen Barrett at the Brockton District Court about her court card. Barrett subsequently called SPAM to clarify the current court-card policy, and, in the course of the conversation, she complained to appellee Bennett about the abrupt manner in which she claimed Burns had dealt with her and the assistant district attorney with whom she was working that day. In June 1995, when the issue of the new court-card policy was on the agenda of a regularly scheduled meeting of representatives from SPAM and the Department of State Po-

lice, Bennett brought up the incident involving Barrett and stated that Burnss conduct could constitute sexual harassment.[1]

After the meeting, although no complaint had been filed pursuant to established state police policy, a formal harassment investigation was initiated. When interviewed as part of that inquiry, Trooper Barrett denied ever claiming to have been harassed, sexually or otherwise, by appellant. Bennett, too, at some point denied making an allegation of sexual harassment. Burns was notified in March 1996 that he had been cleared.

The "Fourth Incident" centered on a column printed in SPAMs in-house newspaper, *The Trooper*. The column, written by the pseudonymous "Corporal Midnight," featured a letter, by an anonymous author, making a thinly veiled reference to Burnss exemption from the state police ban on facial hair. Referring only to a "hypothetical" officer, the letter and answer suggested that he had committed perjury when he disclaimed any skin trouble on his application for his previous job with METS; the column also indicated that the officer in question was fired from a federal government position for refusing to shave. Burns, who has a condition that makes shaving painful, is the only former METS officer now with the state police who is permitted to wear a beard. It is undisputed that he was never fired by a federal employer.

Burnss complaint alleges that Bennett and SPAM acted with racial animus in orchestrating these incidents to undermine his authority and to discredit the Massachusetts Minority State Police Officers Association (MMSPOA), a fraternal association of minority state police officers. Burns was a founding member of the

---

1. Burns testified at deposition that he was escorted around the courthouse that day by a trooper, Robert Casassa, who introduced him to Barrett. He said Barrett gave her court card to Casassa, who in turn handed it to him. He looked at it, returned it to Casassa, and then Casassa returned it to Barrett. Burns said Casassa then took him to the district attorneys office and the clerks office, and later to the second floor of the courthouse, where they encountered other officers whose cards the pair inspected in the same way.

MMSPOA, which was formed after the consolidation of the various Massachusetts police forces, and he has served as its vice president since its origin. He attributes his failure to attain the rank of colonel to the efforts of appellees to diminish his reputation.

Although Burnss complaint contains no specific factual support for his claim of racial bias, he testified at deposition that Bennett and other members of SPAM had opposed creation of the MMSPOA. He viewed their opposition as reflecting racial animosity because of the organizations purpose to represent officers of color, and he reported that, when he and the MMSPOA president met with SPAM executive board members to inform them of the new organization, they were received poorly. Burns testified that one individual, not appellee Bennett, told them, " 'If I ever find or hear that you are approaching minority members of SPAM to join your organization, Im going to come after you and Im going to get you.' " Burns understood this as an assertion by the officer that "there was no room for minorities to be forming an organization and he was not going to stand by while that happened." Burns further testified that a SPAM leader, also not Bennett, asserted that there was no need for "another organization that would speak for members of the Department."

In addition, Burns stated that some of his colleagues on the force had told him about racist comments made by some officers who were unhappy that the merger of police organizations had brought high-ranking minorities to the state police force. These unidentified officers reportedly stated that "they didnt want any officers of color telling them anything."

The MMSPOAs president, Albert Toney, also testified about the negative reaction of some SPAM leaders to the formation of the minority organization, including an angry accusation by a board member that the MMSPOA would promote unfair affirmative action policies. Among other actions and statements discrediting the MMSPOA that Toney attributed to SPAM officials, but not specifically to appellee Bennett, were notices sent to individuals who had advertised in the MMSPOAs newspaper, *The Sentry,* advising them that the MMSPOA is "not a legal association, that we are not a credible association, that they should not give [advertising revenue] to us." He also pointed to statements by SPAM members, in response to telephone inquiries from potential *Sentry* advertisers, that the MMSPOA was being investigated by the Attorney Generals office and that the people affiliated with the organization are "nothing but a bunch of crooks and ... not State Police officers." Toney testified that he considers SPAM a racist organization because of comments such as the one described earlier about affirmative action, because he has been called "nigger" "on occasion" by one member of the SPAM executive board, and because of incidents in 1978 and 1985 in which SPAM failed to support him on issues linked to race.[2]

The district court concluded that this evidence did not add up to a § 1985 violation because "a corporation cannot conspire with its own members acting within the scope of their employment," and the record failed to demonstrate any conduct by Bennett beyond his authority as an officer of SPAM. On appeal, appellant contends that the court erred in applying the "intracorporate conspiracy doctrine" to these facts. *See, e.g., McAndrew v. Lockheed Martin Corp.,* 206 F.3d 1031, 1036–38 (11th Cir.2000) (*en banc* ) (discussing origin of doctrine and applicability to § 1985 claims). In response, the appellees argue that the court properly concluded that a conspiracy between an organization and a single individual member is not viable, and they further maintain that appellants claim

---

**2.** One of these again involved the use of the word "nigger," and the other situation, which was not fully described in the record, apparently involved several episodes of "petty" harassment that Toney attributed to his race.

is deficient because, *inter alia,* his facts establish neither racial motivation nor an agreement to act unlawfully. Although appellants claim may be flawed in multiple respects, we focus only on the absence of evidence of racial animus.

## II. *Discussion*

■■■■ To state a claim under § 1985(3),[3] a plaintiff must, among other requirements, allege the existence of a conspiracy intended to deprive an individual or class of persons of protected rights based on " 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus,' " *Aulson v. Blanchard,* 83 F.3d 1, 3 (lst Cir.1996) (quoting *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)).[4] We have reviewed carefully the record submitted on appeal. Although it contains the deposition testimony described above, reporting statements that could be interpreted as racially biased on the part of a few members of SPAM including two members of the union's board the record contains neither evidence of racial animus on the part of defendant Bennett nor evidence that any of the purported conspiracy's four overt acts cited in the complaint was the product of racial animosity. There is, in short, virtually no probative evidence of racial motivation for the challenged conduct, and certainly insufficient evidence to permit a jury to find that the defendants engaged in a conspiracy in violation of § 1985.

We explain this conclusion by considering each of the four specified incidents at the foundation of Burnss case. The first two, the anonymous and false accusations of a physical altercation and fondling, were in no meaningful way linked to either defendant. Appellants deposition testimony was that SPAM must have been involved in these complaints because the union would have the role of representing troopers against management, and union officials therefore would have had direct access to the commanding officers who were responsible for initiating the investigations. Even if this highly speculative scenario were sufficient to bring to a jury, which it is not,[5] *see Pagano,* 983 F.2d at 347 (holding that nonmovant may not defeat summary judgment motion by relying on evidence that is "merely colorable" or "not significantly probative"), there is no

---

3. The statute confers a private right of action for injuries occasioned when "two or more persons ... conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws...." 42 U.S.C. § 1985(3).

4. In *Village of Willowbrook v. Olech,* 528 U.S. 1073, ——, 120 S.Ct. 1073, 1074, 145 L.Ed.2d 1060 (2000) (per curiam), the Supreme Court observed that an equal protection claim could be stated where a plaintiff alleges that "she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment" creating a "class of one" cause of action, without regard to subjective motivation. The case before us, however, involves a statutory claim that extends to private conspirators, not a constitutional equal protection claim, and we therefore adhere to caselaw construing § 1985's references to equal protection to require racial motivation or other invidiously discriminatory animus against a class. *See*

*Aulson v. Blanchard,* 83 F.3d 1, 3 (lst Cir. 1996) (quoting *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)); *see also Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 267–69, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993). In any event, aside from a brief response to a question from the court at oral argument, appellant has pursued his claim based only on a racially motivated conspiracy. Any other theory is therefore waived.

5. Appellant offers as evidence of conspiracy the fact that the fondling allegation was discussed at two SPAM executive board meetings in March 1993, before the incident supposedly occurred. Although the investigation was opened in May 1993, the record does not indicate that the incident was alleged to have occurred at that time. The minutes from the two March meetings make brief references to the fondling allegation, essentially reporting that the matter was discussed. Bennett was present at both meetings, but there is no evidence that he participated in the discussion.

evidence that racial animosity played a role in either incident. When asked in deposition why he attributed the investigations to racial animus, appellant pointed only to the negative response to the formation of the MMSPOA and statements from colleagues that some state police officers were racists. Defendant Bennett is not identified as one of those officers, and the record lacks support for an inference that he conspired through these incidents to sully appellants reputation on any basis, much less on the basis of race.

Appellant acknowledges, moreover, other reasons for antipathy toward him, including his exemption from the ban on facial hair. He testified that he was targeted for negative treatment because he did not fit the usual mold for state police officers, both because of his facial hair and because he "has stood up and taken certain positions on certain issues [that] made [him] unpopular." He also reported displeasure among some longtime troopers with his entry into the state police force from the METS at the high rank of captain.[6] The evidence of other possible motivations for the unsubstantiated complaints against him further weakens his already attenuated allegation of racial animus.

The other two incidents similarly fail to back up the claim of a racially motivated conspiracy. Taking them out of sequence, the fourth incident, the newspaper article, directly jabs at appellants exemption from the ban on facial hair without any evidence of racial motivation. Moreover, so far as the record indicates, Bennett was not involved at any stage in the publication of the article. The newspapers editor, Thomas Neff, testified that he was the only person who saw the anonymous letter before it was published.

The third incident offers more substance, but it too falls short of substantiating a § 1985 claim. It is undisputed that Bennett brought to a labor-management meeting Trooper Barretts complaint about appellants conduct in checking the forces new court-card procedure, and the record shows that Bennett suggested at the meeting that the conduct could be viewed as sexual harassment. The record also unequivocally establishes that Barrett, while unhappy with appellants manner during their exchange about court cards, never accused appellant of harassment.

The investigation referral form, as well as the notice received by appellant at the completion of the investigation, identified Bennett as the source of the complaint during the labor-management meeting.[7] The person who signed both of those forms, Valian Norris, Director of Human Resources for the State Police, testified in deposition, however, that management notes of the meeting did not reflect a specific allegation of sexual harassment by Bennett, and she reported that Bennett denied making an allegation of sexual harassment when contacted by the investigator assigned to the case.[8] She stated

---

6. Although appellant attributes some of the bad feelings about his rank to a perception that he benefitted as an African–American from affirmative action policies within the METS, these sentiments are not linked to defendant Bennett and thus do not aid his claim.

7. The notice to Burns stated, in part, as follows:

> I am forwarding to you a summary of the recently concluded investigation into the allegations of harassment made by Sergeant Dean Bennett on behalf of Trooper Kathleen Barrett. As you know, Sergeant Bennett alleged that Trooper Barrett was harassed by you. Following a detailed investigation, it was found that these allegations were unfounded.
> Trooper Barrett stated that the allegations made by Sgt. Bennett were not true, that she never had any conversation in which she alleged that you had harassed or sexually harassed her, and that she has never been harassed or sexually harassed by you. The investigation concluded that you did not harass or single out Trooper Barrett.

8. In his deposition, Bennett stated that the situation was

> taken out of context completely.... I was not making an allegation, I was making a point.... What I said was when you have

that the decision to conduct an investigation was made following the meeting by the Deputy Superintendent, Lt. Colonel Thomas Kennedy, whose duties included responsibility over complaints of discrimination and sexual harassment. She did not know why the investigation continued after Bennett reported to the investigator that he had not made an allegation of sexual harassment.

Nothing in the record contradicts Norriss and Bennetts testimony indicating that Bennett brought Barretts complaint to the labor-management meeting as an example of issues surrounding the new court-card procedure and that he was not involved in the decision to initiate a formal investigation. Though the record indicates that he provoked the investigation by his statements at the meeting, any conclusion that Bennett conspired with SPAM to accuse Burns falsely would be wholly without support. Most importantly, there is once again no evidence surrounding this episode that is probative of racial animus.

In sum, appellant has attempted to construct a civil rights conspiracy case by superimposing general allegations of racism by a few members of the state police force not including Bennett on several incidents in which appellant unquestionably was treated unfairly. He relies most heavily on opposition expressed by SPAM board members to creation of the MMSPOA, but the only comment with racial content was a statement by one individual about affirmative action policies. Even if the more generic opposition to formation of the MMSPOA were taken as evidence of racial bias, a factfinder could not conclude, on this record, that that animus motivated Bennett and SPAM to jointly instigate any of the four incidents that appellant claims tarnished his reputation and frustrated his aspirations.

We do not take lightly appellants claims of unjust treatment, but he has failed to provide sufficient evidence to allow a jury to find that these defendants engaged in a racially motivated conspiracy to cause him harm.

*The judgment of the district court is therefore affirmed.*

an individual going in and picking on one particular person when there are others in the area of the same rank being there for the same purposes that everybody should be

inspected and not just one person and when the person happens to be a female you run the possibility of someone coming up with a claim of sexual harassment.