Dr. Rebecca ALBERTI,
FNP, ND, Plaintiff

v.

UNIVERSITY OF PUERTO RICO; Dr. Jose R. Carlo Izquierdo; Dr. Suane E. Sánchez Colon; Dr. Gloria E. Ortiz Blanco; Dr. Angelica Matos Rios; Carmen T. Lopez Rodriguez; Leyra Figueroa Hernandez; Dr. Maria C. Declet Braña; Iris Ramos; Iris Rivera Colon; and Judith Miranda, Defendants.

Civil No. 08–1484 (DRD).

United States District Court, D. Puerto Rico.

Oct. 13, 2011.

454

456

Manuel R. Suarez–Jimenez, Manuel R. Suarez Law Office, San Juan, PR, for Plaintiff.

Diego Ramirez–Bigott, Raquel M. Dulzaides, Jimenez, Graffam & Lausell, San Juan, PR, for Defendants.

## AMENDED OPINION AND ORDER NUNC PRO TUNC

DANIEL R. DOMINGUEZ, District Judge.

Pending before the Court is Defendants' *Motion for Summary Judgment* (**Dockets # 161, # 163 and # 164**), and Plaintiff's *"Opposing Statement of Material Facts"* (**Docket # 179**),[1] accompanied by *Defen-*

---

1. *Plaintiff's "Opposing Statement of Material Facts"* was originally filed on July 6, 2011, without appropriate supporting Exhibits. (**Docket # 179**) The Court graciously granted Plaintiff until midday of July 8, 2011, to file the Exhibits. (**Docket # 181**) However, Plaintiff failed to comply with the Court's Order, and filed the supporting Exhibits at 4:45 p.m. (**Docket # 186**) Moreover, we note that Plaintiff did not file certified translations of the Exhibits in the Spanish language; to wit: Exhibits 9, 10, 11, 12, 13, 15, 17, 18, 19, 20, 21, 22, 24, 25, 26, 27, 28, 29, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 46, 47, 48, 51, 52, 53, 54, 55, 58, 59, 62, 63, 66, 67, 68, 69, 70, 73, 76, 84, 86, 87, 88, 89, 91, 92, 94, 96, 97, 98, 100, 101, 102, 103, 105, 107, 110, 111, 114, 115, 116, 119, 120, 121, 123, 125, 133, 135, 136, 137, 138, 139, 140, 141, 142, and 146. Hence, the Court is barred from considering said documents at the time of our analysis, as to the outcome of the instant summary judgment. *United States v. Rivera–Rosario*, 300 F.3d 1, 5–6 (1st Cir.2002); *Cordero–Soto v. Island Finance, Inc.*, 418 F.3d 114, 118 (1st Cir.2005); *Peña–Crespo v. Commonwealth of Puerto Rico*, 408 F.3d 10, 14 (1st Cir.2005).

dants' *"Opposition to Plaintiff's Opposing Statement of Material Facts"* (**Docket # 194**).[2] For the reasons set forth below, the Court will **GRANT** the Motion for Summary Judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, Dr. Rebecca Alberti (**"Plaintiff" or "Alberti"**), who was born in the continental United States, is a Family Nurse Practitioner with a nursing doctorate. Alberti worked on two (2) separate occasions for the Co–Defendant University of Puerto Rico (**"University" or "UPR"**). Both times she was, *inter alia,* responsible for acquiring funds and developing a Family Nurse Practitioner (**"FNP"**) Program in the School of Nursing (**"SON"**). She first worked for the University from 2001 until November 2002, when she resigned. (**Docket # 164, Exhibits 3, 4, 5, 6 and 7**)

Three (3) years after the academic Senate approved the creation of the FNP Program, Co–Defendant Dr. Suane Sánchez (**"Sánchez"**), the then Dean of the SON, recruited Alberti and offered Plaintiff a position as FNP Program and Grant Director of the SON (**hereinafter collectively referred to as "FNP Program Director"**), a non-career trust position as discussed *infra,* and a probationary appointment as "Associate Professor", also as discussed infra. (**Docket # 164, Exhibits 8, 9, 10, 11, 12, 13, 14, 15, and 16**).

Alberti accepted the job and worked as FNP Program Director from May 23, 2006 until February 14, 2008, when she was removed by Co–Defendant Dr. Jose Carlo (**"Carlo"**), the then Chancellor and nominating authority of the Medical Science Campus of the University. (**Docket # 164, Exhibits 13 and 59**) Approximately six (6) months later, on August 15, 2008, Alberti's probationary appointment as Associate Professor was terminated, because of a myriad of administrative issues and problems with Plaintiff's performance. (**Docket # 164 Exhibits 21–55, 59, 64, 65, 66, 67, 68, 69, 70**)

On April 25, 2008, Plaintiff filed a Complaint alleging that her removal as FNP Program Director, and later termination

---

Plaintiff reiteratedly violated L.Cv.R.56 by: (1) failing to include particularized citations to the record and supporting evidence; and (2) mixing Plaintiff's Opposing Statement of Material Facts with statements admitting, denying, or qualifying Defendants' Statement of Material Facts, as well as legal arguments. These fatal flaws force the Court to consider as uncontested most of Defendants' Statements of Uncontested Material Facts. *Morales v. A.C. Orssleff's EFTF,* 246 F.3d 32, 33–34 (1st Cir.2001) (finding that, where a party fails to buttress factual issues with proper record citations, judgment against the party may be appropriate); *Gutiérrez–Lines v. Puerto Rico Electric and Power Authority,* 751 F.Supp.2d 327, 334 (D.P.R.2010); *Cabán Hernández v. Philip Morris USA, Inc.,* 486 F.3d 1 (1st Cir.2007).

2. On July 20, 2011, Plaintiff filed a *Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment.* (**Docket # 191**) Plaintiff's Memorandum was filed *fourteen*

*(14) days* after it was due, and in violation of a Court Order. (**Docket # 181;** *see also* **Docket # 192,** *Defendants' Motion to Strike* ) The Court had granted Plaintiff several requests for extension of time to file an Opposition to Defendants' Motion for Summary Judgment, and had advised Plaintiff on various occasions that it would not grant further extensions, or allow the filing of any additional documents. (**Dockets # 172, # 173, # 175 and # 181**) Consequently, because the Memorandum was untimely, the Court will not consider *Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment.* (**Docket # 191**) The Court notes that even if it would have considered Plaintiff's Memorandum, its decision to dismiss this case would not have changed, because Plaintiff has not met the burden of producing specific facts sufficient to defeat the "swing of the summary judgment scythe." *Noviello v. City of Boston,* 398 F.3d 76, 84 (1st Cir.); see also *Morales,* 246 F.3d at 34.

from of the probationary appointment as Associate Professor: (1) deprived her of property without due process of the law in violation of the Fourth, Fifth and Fourteenth Amendment of the United States Constitution and 42 U.S.C. §§ 1983; and (2) were acts of retaliation in violation of the First Amendment of the United States Constitution, 42 U.S.C. § 1983 and Puerto Rico Law No. 115 of December 20, 1991 ("Law 115"), 29 L.P.R.A. §§ 194–194b (**Docket # 1**). Later, Alberti amended the *Complaint* several times to include a cause of action under 42 U.S.C. § 1985(3) for an alleged conspiracy to deprive her of constitutional rights; under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e and Puerto Rico Law No. 100 of June 30, 1959 ("Law 100"), 29 L.P.R.A. §§ 146–151, alleging national origin discrimination. (**Dockets # 8, # 9, # 56 and # 123**).

Plaintiff also includes as Co–Defendants seven (7) officials of the UPR (Dr. José Carlo, Dr. Suane Sánchez, Dr. Gloria Ortiz, Dr. Carmen López, Virginia Santiago, Esq., Dr. Angélica Matos and Prof. Leyra Figueroa) and three (3) former students of the FNP Program (Ms. Judyth Miranda, Ms. Iris Ramos and Ms. Iris Rivera).

## APPLICABLE LAW AND DISCUSSION

### I. The Summary Judgment Standard

Generally, "[s]ummary judgment is proper where 'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law.' Fed.R.Civ.P. 56(c)." *Richardson v. Friendly Ice Cream Corporation,* 594 F.3d 69, 74 (1st Cir.2010). See also *Celotex Corp. v. Catrett,* 477 U.S. 317, 324–325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Thompson v. Coca–Cola, Co.,* 522 F.3d 168, 175 (1st Cir.2008). "The object of summary judgment is 'to pierce the

boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required'." *Dávila v. Corporación de Puerto Rico Para La Difusión Pública,* 498 F.3d 9, 12 (1st Cir. 2007), citing from *Acosta v. Ames Dep't Stores, Inc.,* 386 F.3d 5, 7 (1st Cir.2004), (quoting *Wynne v. Tufts Univ. Sch. of Med.,* 976 F.2d 791, 794 (1st Cir.1992)). In *Dávila,* the Court held:

> For this purpose, an issue is genuine if a reasonable jury could resolve the point in favor of the nonmoving party. *Suárez v. Pueblo Int'l, Inc.,* 229 F.3d 49, 53 (1st Cir.2000). By like token, a fact is material if it has the potential to determine the outcome of the litigation. See *Calvi v. Knox County,* 470 F.3d 422, 426 (1st Cir.2006). Where, as here, the nonmovant has the burden of proof and the evidence on one or more of the critical issues in the case "is ... not significantly probative, summary judgment may be granted." *Acosta,* 386 F.3d at 8 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

At the summary judgment stage, the Court "must scrutinize the evidence in the light most agreeable to the nonmoving party, giving that party the benefit of any and all reasonable inferences". *Noviello v. City of Boston,* 398 F.3d 76, 84 (1st Cir. 2005), citing *Cox v. Hainey,* 391 F.3d 25, 27 (1st Cir.2004). See also *Richardson,* 594 F.3d at 74. "[T]he nonmovant bears 'the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe.'" *Noviello,* 398 F.3d at 84. "Those facts, typically set forth in affidavits, depositions, and the like, must have evidentiary value; as a rule, '[e]vidence that is inadmissible at trial, such as, inadmissible hearsay, may not be considered on summary judgment.'" *Id.* at 84, citing *Vázquez v. López–Rosario,* 134 F.3d 28, 33

(1st Cir.1998); accord *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir.1990). "The evidence presented by the non-moving party may not be 'conclusory allegations, improbable inferences, [or] unsupported speculation.'" *Torres–Negrón v. Merck & Company, Inc.*, 488 F.3d 34, 39 (1st Cir.2007), citing *Medina–Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990).

■ Lastly, whether a motion for summary judgment is formally opposed or unopposed, the Court is still obligated to resolve the motion on the merits. *See Cordi–Allen v. Halloran*, 470 F.3d 25, 28 (1st Cir.2006) (noting that a district court is bound to review an unopposed motion for summary judgment on the merits). Moreover, the court cannot grant a motion for summary judgment as a sanction. *See De La Vega v. The San Juan Star, Inc.*, 377 F.3d 111, 113, 116 (1st Cir.2004). *See also Sterling Merchandising, Inc. v. Nestle, S.A., et al.*, 656 F.3d 112 (1st Cir. (Puerto Rico) 2011) (Lynch, J.)); *Curet–Velázquez, et al. v. ACEMLA de Puerto Rico, Inc., et al.*, 656 F.3d 47 (1st Cir. (Puerto Rico) 2011) (Torruella, J.).

Based on this premise, the Court proceeds with the analysis.

## II. Eleventh Amendment Immunity

■ The Eleventh Amendment proscribes that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." 1 U.S.C. Const. Amend. XI. It has long been held that under the Eleventh Amendment, federal courts lack jurisdiction to hear suits seeking damages against a state or its instrumentalities. *Rios–Montoya v. Puerto Rico*, Civ. 09–2229(CCC), 2011 WL 3322556 (D.Puerto Rico 2011 (August 2, 2011)), (citing *Figuer-*

*oa–Rodríguez v. Aquino*, 863 F.2d 1037, 1044 (1st Cir.1988); *Ramírez v. Puerto Rico Fire Service*, 715 F.2d 694, 697 (1st Cir.1983)).

■ Nonetheless, a state can waive its Eleventh Amendment immunity or it can be abrogated by Congress. "A state can waive its Eleventh Amendment immunity to suit in three ways: (1) by a clear declaration that it intends to submit itself to the jurisdiction of a federal court or administrative proceeding, *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999); *Great N. Life Ins. Co. v. Read*, 322 U.S. 47, 54, 64 S.Ct. 873, 88 L.Ed. 1121 (1944); (2) by consent to or participation in a federal program for which waiver of immunity is an express condition, *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 246–47, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985); or (3) by affirmative conduct in litigation, *Lapides v. Bd. of Regents*, 535 U.S. 613, 620, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002); *Gardner v. New Jersey*, 329 U.S. 565, 574, 67 S.Ct. 467, 91 L.Ed. 504 (1947)." *New Hampshire v. Ramsey*, 366 F.3d 1, 15 (1st Cir.2004).

■ "Puerto Rico, despite the lack of formal statehood, enjoys the shelter of the Eleventh Amendment in all respects." *Ezratty v. Commonwealth of Puerto Rico*, 648 F.2d 770, 776 (1st Cir.1981). Moreover, "[a]n administrative arm of the state is treated as the state itself for the purposes of the Eleventh Amendment, and it thus shares the same immunity." *Vaquería Tres Monjitas v. Irizarry*, 587 F.3d 464, 477 (1st Cir.2009) (citing *Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991)). "Indeed, the UPR has been deemed an arm of [Puerto Rico] for more than three decades". *Irizarry–Mora v. University of Puerto Rico*, 647 F.3d 9, 13 (1st Cir.2011), (citing *Pinto v. Universidad De P.R.*, 895 F.2d 18, 18 (1st

Cir.1990); *Pérez v. Rodríguez Bou,* 575 F.2d 21, 25 (1st Cir.1978)).[3]

In *Irizarry–Mora,* the Court considered anew the factors under which the UPR was to be considered an arm of state. Among the factors the Court took into consideration to confirm the long standing precedent, are: the purpose of the UPR to service the people of Puerto Rico, 18 L.P.R.A. § 601(a); and that the University is also exempt from paying taxes. *Id.* § 612(f).

Further, the Governor with the consent of the Senate of Puerto Rico appoints ten (10) of the thirteen (13) members of the Board of Trustees. *Id.* § 602(b)(1) and Article 13, Sec. 13.1 of the Rules and Regulations of the UPR. The Board of Trustees is the entity that appoints the President, Chancellor and the Director of Finance of the University; with the advice of the academic senates of the Institution. *Id.* § 602(e)(7), (8) and Articles 14 and 19 of the Rules and Regulations. The Board of Trustees is the statutory entity that oversees the progress of the Institution. *Id.* § 602(d) and Articles 13 and 16 of the Rules and Regulations. The annual budget of the University is approved by the Board of Trustees, who yearly are required to report to the Governor and the Legislature the financial status of the University. *Id.* § 602(e), (9), (10). It is the Government of Puerto Rico who provides the vast majority of the funds for the University's operations. *Id.* § 621–1; see generally *Irizarry–Mora,* 647 F.3d at 14–17.

Since there exists an imbued Eleventh Amendment immunity issue, the Court finds prudent to examine the extension of the doctrine to the School of Nursing ("SON"). The 2005 By–Laws of the SON reveal that the school is an integral part of the UPR Medical School Campus; the By–Laws are congruent with those of the UPR; the Dean of SON responds to the Chancellor of the Medical Sciences School; and the appointed Dean, as part of the duties inherent to the position, prepares an annual budget in harmony with the Medical Science Campus and the UPR's budget. **(Docket # 164, Exhibit 13, Introduction and p. 2).** Further, the SON constitutes an integral part of the UPR's system, as verified in the Proposal for HRSA, Advanced Practice Nursing Family Nurse Practitioner prepared by Plaintiff in performance of her duties, for purposes of obtaining the federal funds. **(Docket # 164, Exhibit 12).** Page 4 of the Proposal identifies the Applicant's name as: University of Puerto Rico, Medical Sciences Campus, School of Nursing. Therefore, the Court concludes easily that the SON constitutes an integral part of the University of Puerto Rico; and as such is entitled to the same treatment as an arm of the state entity under the Eleventh Amendment immunity as extended to the UPR.

■ Resulting from the recent holding in *Irizarry–Mora,* this Court anew evaluates whether the States' Eleventh Amendment immunity afforded to the UPR as an arm of the Commonwealth of Puerto Rico is abrogated as to Title VII. *Irizarry–Mora* was a case under the Age Discrimi-

**3.** Notwithstanding, Plaintiff questions the often repeated doctrine that the University of Puerto Rico is indeed an arm of the state. **(Docket # 204).** The Commonwealth of Puerto Rico and the arms of the State are entitled to Eleventh Amendment immunity as agreed by the Supreme Court in *Puerto Rico Aqueduct And Sewer Authority v. Metcalf & Eddy,*

*Inc.,* 506 U.S. 139, 144–147, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) ("Petitioner maintains, and we agree, that the same rationale ought to apply to claims of Eleventh Amendment immunity made by States and state entities possessing a claim to share in that immunity").

nation in Employment Act, and under the particular circumstances of said case, the Eleventh Amendment Immunity was afforded to the UPR.

On the other hand, the United States Supreme Court held that Title VII claims are not barred by the Eleventh Amendment. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 447–448, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). Congress in the 1972 Amendments to Title VII, "authorized federal courts to award money damages in favor of a private individual against a state government found to have subjected that person to employment discrimination on the basis of 'race, color, religion, sex, or national origin.'" *Id.* In the 1991 Amendments, Congress added punitive and compensatory damages to the relief that a plaintiff may recover under Title VII. *Cardona Román v. University of Puerto Rico,* 799 F.Supp.2d 120, 129, 2011 WL 3204837, at *6 (D.Puerto Rico (July 27, 2011)).

In 2003 the Government of Puerto Rico raised before the First Circuit the issue that the 1991 Civil Rights Act failed to validly abrogate the States' Eleventh Amendment immunity in relation to the incorporation of compensatory damages. However, the First Circuit did not decide the issue because it fell beyond their purview at that time. *Espinal–Domínguez v. Commonwealth of Puerto Rico,* 352 F.3d 490, 492 (1st Cir.2003).

The Court recognizes that the express language in Title VII's 1972 Amendments, enabling private individuals to bring suit against a state government, has since been found to have abrogated Puerto Rico's Eleventh Amendment immunity, allowing the filing of Title VII claims against Puerto Rico and its instrumentalities in this District Court. *Roman v. Commonwealth*

*of Puerto Rico,* No. 08–1378, slip op., 2010 WL 3419974 (D.Puerto Rico); *Nieves–Garay v. Puerto Rico Police Dept.,* No. 09–1959, slip op., 2011 WL 2518801 (D.Puerto Rico); *Rey–Cruz v. Forensic Sci. Inst.,* 794 F.Supp.2d 329, 2011 WL 1868841 (D.Puerto Rico (May 16, 2011)).

██ The Court clearly also finds that Title VII applies to the University of Puerto Rico. *Cardona Román,* 799 F.Supp.2d at 130, 2011 WL 3204837, at *7. Therefore, we analyze Plaintiff's claim as to Title VII later in this Opinion considering the full application of Title VII employment rights to the University.

### III. Property Rights

Plaintiff is seeking relief against the individual Defendants for an alleged deprivation of property without due process of the law in violation of the Fourth, Fifth and Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983, as Plaintiff alleges being removed from her administrative role as Director of the FNP Program and terminated from her probationary appointment as Associate Professor at the SON [4].

The record shows that Alberti became FNP Program Director and Associate Professor in a tenure-track probationary position, effective July 1, 2006. **(Docket # 164 Exhibits # 12 and # 13)**.[5] On February 13, 2008, she was removed from the position as FNP Program Director, and on August 15, 2008, Plaintiff's probationary appointment as Associate Professor was terminated. **(Docket # 164, Exhibits # 34 and # 37)** According to Plaintiff she had a cognizable property interest in both positions. Defendants argue that the FNP Program Director position constituted un-

---

4. Plaintiff specifically *excluded Co–Defendant the University from this cause of action.* **(Docket 123, *Third Amended Complaint.* p. 4–5, ¶ 1, 6 and 7, p. 36, ¶ 121–123)**

5. **Exhibit 12 is Plaintiff's probationary appointment contract as Associate Professor, and Exhibit 13 the letter appointing Alberti FNP Director.**

doubtedly a position of trust, which according to the Article 30, Section 30.1.8 of the Rules and Regulations of the University could be terminated at will by the Chancellor. (**Docket # 164, Exhibit 4, Rules and Regulations of the University, Article 30, Sec. 30.1.8**). Pursuant to Article 30, Section 30.1.2 Plaintiff's appointment of Associate Professor was probationary, falling short of the threshold of a position that had earned a property interest. Defendants alleged that Plaintiff at the time of termination had not earned a cognizable property interest in the professorship job under a probationary contract.

It is well established that the Constitutional procedural protection of property is a safeguard of the property interests that a person has already acquired in specific benefits. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). These property interests may take many forms. In the area of public employment it has been held that a public college professor dismissed from an office held with tenure; and college professors dismissed during the terms of a contract that has not expired, have interests in continued employment that are safeguarded by due process. *Id.*; see also *Slochower v. Board of Education*, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956); and *Wieman v. Updegraff*, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952).

▮▮▮ Under the Fourteenth Amendment, a state is prohibited from discharging a public employee who possesses a property interest in continued employment without due process of law. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); meaning that the Fourteenth Amendment guarantees public employees with a property interest in continued employment the right to an informal hearing prior to being discharged. *Id.* at 542, 105 S.Ct. 1487. However, the Constitution does not create property interests, instead "they [the party's rights] are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents of State Colls.*, 408 U.S. at 577, 92 S.Ct. 2701 In order to establish a constitutionally protected property interest, the Plaintiff must demonstrate that she has a legally recognized *expectation* that she will retain the position. A legitimate expectation of continued employment may derive from a statute, a contract provision, or an officially sanctioned rule of the workplace. *Perry v. Sindermann*, 408 U.S. 593, 601–602, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

The Court is mindful that the only source of state law that could grant a property right in an employment position at the UPR is found in the General Rules and Regulations of the University, which were enacted pursuant to 18 L.P.R.A. §§ 602 and 608. Therefore, it follows that if the law and/or the Rules and Regulations of the University do not afford an individual with a property right and/or create a legally recognized expectation of having a property right at the time of termination, the person simply does not possess such right. "A written contract with an explicit tenure provision clearly is evidence of a formal understanding that supports a teacher's claim of entitlement to continued employment unless sufficient 'cause' is shown." *Perry v. Sindermann*, 408 U.S. at 601–602, 92 S.Ct. 2694.

It is also worth noting that if the individual's claim to a property right is predicated on acts which contravene the referenced Rules and Regulations, the individual would not possess a legally cognizable property right. *Kauffman v. PRTC*, 841 F.2d 1169, 1173 (1st Cir. 1988); *see also Colón v. Mayor of Mu-*

*nicipality of Ceiba,* 112 D.P.R. 740, 746 (1982).

Based on the above mentioned case law, the Court must review all pertinent Articles and Sections of the Rules and Regulations of the University in conjunction with the relevant evidence on the record, to determine if Plaintiff possessed a constitutionally protected property interest. Since Plaintiff's claim encompasses two (2) different types of appointments, the Court will first analyze Plaintiff's position as FNP Program Director, followed by an analysis of the probationary appointment as Associate Professor.

## A. Property Interest as the FNP Program Director.

 To demonstrate that there was a constitutionally protected property interest in the position of Director of the FNP Program, Plaintiff has to show that she had a legally recognized expectation that she would retain said position. *Perry,* 408 U.S. at 601–602, 92 S.Ct. 2694. After reviewing the Rules and Regulations of the University and the evidence on record, the Court finds that Plaintiff could never have attained such expectation, given that: (1) the position was one of trust, which could be terminated at the will of the Chancellor;(2) the Rules and Regulations of the University specifically prohibit individuals who occupy teaching and managerial positions, like Plaintiff, from attaining permanence in the managerial position; and (3) the Rules and Regulations of the University prohibit anyone from obtaining permanence in a position without first undergoing a probationary period for a minimum of five (5) years.

### Position of Trust v. Tenure

Pursuant to Article 30, Sec. 30.1.8 of the Rules and Regulations of the UPR a position of trust is one which can be terminated at the will of the Chancellor. Article 30, Sec. 30.1.8 defines "Trust Appointment" as one:

... awarded to university personnel that is classified as trust personnel under Chapter VIII, Article 71 of these Regulations. **Trust personnel shall be chosen and removed at will** when posts and positions are so classified, but shall retain the rights that may have been acquired by virtue of some prior regular appointment within the system. (emphasis ours) (**Docket # 164, Exhibit 4, Rules and Regulations of University of Puerto Rico, Article 30, Sec. 30.1.8**)

Also, Article 66, Sec. 66.2.1, states that a person who occupies a faculty and administrative position, like Alberti did, directly participates in the formulation of academic policy. The Section states:

The teaching-administrative function includes: supervising, evaluating, coordinating or directing teaching programs; participating in a direct and non-incidental manner in the creation of academic policies in the faculty, institutional unit, and system level. (**Docket # 164, Exhibit 4, Rules and Regulations of University of Puerto Rico, Article 66, Sec. 66.2.1**)

Pursuant to Article 71, Sec. 71.3.1 of the Rules and Regulations of the University:

The designation of a post or position of trust, whether by law or regulation, or pursuant to the exercise of administrative discretion as authorized by regulation, essentially answers to the demand of harmony and empathy between the person holding said position and the appointing authority." (**Docket # 164, Exhibit 4, Rules and Regulations of University of Puerto Rico, Article 71, Sec. 71.3.1.1**)

Further grounds and criteria for determining whether a position is of trust appears in Article 71, Sec. 71.3.1.2, which specifies that:

The criteria to designate a post or position of trust in the exercise of the approved authority's discretion as allowed by these regulations, are the following: a) That given the nature and functions thereof, the person occupying said position must intervene or collaborate substantially with the creation of the institution's public policy; or b) That the person occupying said position, although he or she may not participate in the creation of public policy, does provide auxiliary or support services to the appointing authority that involve a high degree or personal trust; or c) That the person occupying said position advises or renders services directly to the appointing authority; or d) That the regulations approved by the Board of Trustees has designated such post or position as one of trust. **(Docket # 164, Exhibit 4, Rules and Regulations of University of Puerto Rico, Article 71, Sec. 71.3.1.2)**

Moreover, Section 71.3.2(f) as amended, titled "**Posts or Positions of Trust by Designation of Law or Regulation as amended**", states, in its pertinent part:

The following shall be posts or positions of trust and the persons appointed to occupy them shall be trust personnel:

 a) . . .
 b) . . .
 c) . . .
 e) . . .

 f)Head of organizing units assigned to the institutional units, including Central Administration that, in addition, meet the criteria stated in Section 71.3.1 of Article 71 of the General Rules:

1. Program/Project Administrator
2. Special Aide to the Dean
3. Special Aide to the Director
4. Program/Project Coordinator
5. Associate Dean
6. Assistant Dean
7. Associate Director
8. Assistant Director
9. Library Director
10. Investigation Center Director
11. Pre–School Development Center Director
12. Department Director
13. School Director
14. Institute Director
15. Museum Director
16. Office Director
17. *Programs Director*
18. Magazine Director
19. Professional Studies and Continuing Education Director
20. Medical Director
21. Registrar
22. Associate Vice–President
23. Assistant Vice–President

(emphasis ours)

After considering the applicable Rules and Regulations defining trust appointments in the UPR, the Court will now focus on the duties and responsibilities of Plaintiff as Director of the FNP Program. The uncontested material facts in the record show that as Director of the FNP Program, Plaintiff was responsible for, *inter alia*, administering over one million dollars of federal funds approved for the FNP Program; selecting and purchasing program related equipment; hiring personnel; preparing the academic curriculum for the Program; recruiting students for the Program; evaluating existing classes in the School of Nursing; finding and contracting outpatient clinics where the students could get hands on clinical experience; insuring that the funds were used according to the grant's terms and conditions. **(Docket # 164, SUMF # 16)**

Plaintiff was also responsible for assuming the general direction of all the administrative and academic work of the FNP Program; plan, develop and implement the program of studies; prepare the petition of courses for the Program; prepare the yearly academic load for the faculty of their program following the procedures established in the By Laws of the UPR; establish a systematic and continuous process of evaluation of the academic program; summarize progress and prepare annual progress reports; teach; prepare collaborative research proposal for funding; and participating in the formulation of academic policy. (**Docket # 164, SUMF # 15**)

Carlo, the then Chancellor of the Medical Science Campus, and nominating authority indicated under oath in his deposition that Alberti participated in the formulation of academic policy. Specifically, Carlo testified that Plaintiff had authority to intervene in various academic functions, including, *inter alia*, creating the policy for grades, for passing a course, the requirements for the course, and academic requirements for the Program. (**Docket # 164, SUMF # 63**).

Moreover, in an admission by Alberti through a letter prepared by her dated December 4, 2007 and sent to Carlo, she admits her participation in the formulation of academic policy. In this letter, Plaintiff lists her responsibilities as FNP Program Director, including "creating, developing, and evaluating courses of the FNP specialty that comply with the accreditation agencies and national certification requirements". (**Docket # 164, Exhibit 25, p. 2**).

Similarly, in Plaintiff's letter of December 11, 2007, to Carlo, Alberti admitted that "as Director of this program, I am obligated to supervise the administration of the funds and assure that the objectives are met, adhering to the rules and regula-

tions of the Federal Department of Education, Council of Higher Education, University of Puerto Rico and HRSA." (**Docket # 164, Exhibit 27, p. 1**). These admissions by Plaintiff buttress Defendants' position that Plaintiff participated in the formulation of University policy.

It is evident to the Court that based on the Rules and Regulations a position of trust requires harmony and empathy between the individual who holds the position and the nominating authority, in this case between Alberti and Carlo. (**Docket # 164, Exhibit 4, Rules and Regulations of the University, Article 71, Sec. 71.3.1, cited above in p. 17**) Further, said position is one that requires intervention and collaboration in the creation of the University's public policy and/or academic policy. (**Docket # 164, Exhibit 4, Rules and Regulations of the University, Article 66, Sec. 66.2.1 and Article 71, Sec. 71.3.1.2, cited above in p. 17 and 18**).

The Court also notes that Article 71, Sec. 71.3.2(f) of the Rules and Regulation of the University clearly specifies that the position of Program Director, like the one held by Alberti, is a position of trust. (**Docket # 164, Exhibit 4, Rules and Regulations of the University, Article 71, Sec. 71.3.2(f) as amended, cited above p.p. 18 and 19**). The referenced Rule categorically classifies the position of Program Director held by Alberti as one of trust. Thus, it follows that she could not have attained an expectation of a property right as a Program Director.

Further, and perhaps dispositive by itself, the Court notes that Plaintiff could not have attained an expectation of a property interest in the position as Program Director because pursuant to **Article 46, Section 46.4.4.1** of the Rules and Regulations of the University, a person who occupies a managerial position and a teaching position at the same time, like Alberti who

was the Director of the FNP Program and an Associate Professor, cannot obtain permanence in the managerial position nor receive teaching tenure while performing managerial functions. Specifically, **Article 46, Sec. 46.4.4.1, "Teaching Personnel will not Get Tenure in Managerial Functions"**, indicates:

> There will be no tenure for managerial positions. Members of the teaching staff who get assigned to managerial functions will [not] be able to get teaching tenure while performing those additional functions and tasks, consistent with the principles established in Article 66. (Emphasis ours, brackets in the original). (**Docket # 164, Exhibit 4, Rules and Regulations of the University, Article 46, Sec. 46.4.4.1**).

Finally, the Rules and Regulations of the University in Article 30, Sec. 30.1.1 and **Article 46, Sec. 46.2** also clearly state that in order to acquire permanence in the University a position has to be approved in the budget and the individual has to successfully comply with the probationary work period, which can be no less than five (5) years. (**Docket # 164, Exhibit 4, Rules and Regulations of the University, Article 30, Sec. 30.1.1 and Article 46, Sec. 46.2, cited *infra*** ). There is no evidence on the record showing that there was an approved budget for the FNP Program Director position or that Alberti held the job for at least five (5) years. Alberti was FNP Program Director from July 1, 2006 to February 13, 2008, when she was removed by Carlo. (**Docket # 164, SUMF # 13 and # 59**).

In light of the referenced Rules and Regulations of the University and the uncontested material facts on record, the Court finds that Alberti evidently did not have a property interest in the position of FNP Program Director.

## B. Plaintiff's Probationary Appointment as Associate Professor.

The Rules and Regulations of the University also prove to be of considerable assistance in disposing of Plaintiff's claim that she had a constitutionally protected property right in the probationary appointment as Associate Professor.

Pursuant to **Article 30, Section 30.1.2** of the Rules and Regulations of the University, a probationary appointment like the one held by Alberti, is:

> ... the appointment granted initially to cover a regular post or position approved in the budget, and shall have a fixed duration according to the provisions of these Regulations. During the appointment period the incumbent shall be on probation, subject to an evaluation to determine whether or not at the end of said period he or she merits retention with a permanent appointment. (**Docket # 164, Exhibit 4, Rules and Regulations of the University, Article 30, Sec. 30.1.2**).

The probationary appointment can be terminated by the Chancellor pursuant to **Article 46, Section 46.6** of the Rules and Regulations of the University, "**Termination of Probationary Appointments without Granting Tenure**" which states:

> The Chancellor, or President when the personnel is under his or her administrative jurisdiction, may terminate a probationary appointment without granting tenure **when so justified**, according to the evaluation or evaluations performed, notifying the affected person in writing. (**Docket # 164, Exhibit 4, Rules and Regulations of the University, Article 46, Sec. 46.6**). (Emphasis ours).

On the other hand a career and/or permanent position, which is equivalent to tenure in the UPR, is defined in Article 30, Sec. 30.1.1 as:

... the appointment granted to cover a regular post or position approved in the budget, after the incumbent has satisfactorily complied with his or her probationary work period. The incumbent shall have all the rights and protections established by these Regulations. (**Docket # 164, Exhibit 4, Rules and Regulations of the University, Article 30, Sec. 30.1.1**).

It is evident from the referenced definition that in order to attain tenure, the individual must first comply with the probationary period requirement. This period is defined in **Article 46, Sec. 46.2** of the Rules and Regulations, which states that:

Teaching staff tenure shall be awarded to those persons with a probationary appointment who teach a full load, hold regular positions within the University's functional budget or in any of its dependencies' or institutional units' functional budgets, and who, in the judgment of the competent authorities, has rendered five (5) years of satisfactory service, all of it in accordance with the provisions of the following paragraphs. (**Docket # 164, Exhibit 4, Rules and Regulations of the University, Article 46, Sec. 46.2**).

After analyzing **Article 30, Sec. 30.1.1, 30.1.2, 30.1.8** and **Article 46, Sec. 46.2** of the Rules and Regulations of the University, the Court concludes that it is evident that a person with a probationary appointment cannot obtain a career and/or permanent position without first successfully completing a minimum five (5) year probationary period. (**Docket # 164, Exhibit No. 4, Rules and Regulations of the University of Puerto Rico, Article 30, Sec. 30.1.1, 30.1.2, and 30.1.8; Article 46, Sec. 46.2, cited above in p. 17, 24 and 25**).

There is no controversy as to the fact that Plaintiff's professor contract at the time of termination was probationary. (**Docket # 164, SUMF # 12, # 18 and # 19**). There is also no controversy as to the fact that at the time of Plaintiff's termination she had been working at the University for approximately two (2) years. (**Docket # 164, SUMF # 12 and # 70**).

The Court further does not read in the aforementioned two articles that the nominating authority must retain the person all five (5) years before making a decision. The Court refers to the provisions of Article 46, Sec. 46.6, wherein "the Chancellor ... may terminate a probationary appointment without granting tenure when so justified, according to the evaluation or evaluations performed, notifying the affected person in writing." An otherwise interpretation would allow a professor to violate the norms of the institution for five (5) years while under probation, and the institution would be powerless to act within the probationary period. Thus, the Court finds that Plaintiff's position as Associate Professor was probationary in nature, and at the time of her termination she was not tenured; she was on tenure-track, but on probation.

Even though the Court rejected Plaintiff's "Memorandum in Support of Plaintiff's Opposition of Motion for Summary Judgment" (**Docket # 191**) it will nevertheless entertain Plaintiff's contention that since the Rules and Regulations of the University provide for certain justification prior to terminating a probationary appointment, she then possessed a due process right to a pre-termination hearing. The Court notes however, that Plaintiff did not provide any supporting evidence to create an issue of fact other than her own conclusions, that notwithstanding a probationary contract, she is entitled to a constitutionally protected due process right.[6]

---

6. It is well settled that in order to oppose a motion for summary judgment "a party may

not rest on conclusory allegations, improba-

Plaintiff bases her argument on Article 46, Sec. 46.6, which, *inter alia*, states that the Chancellor can terminate a probationary appointment "when so justified". Plaintiff argues that the requirement of a justification in the cited Rule afforded Plaintiff with an expectation of permanence and a due process right. However, the Court is not persuaded by this argument given that Article 46, Sec. 46.2, of the Rules and Regulations of the University are clear that permanence can only be attained after the candidate complies with the five (5) year minimum probationary period. Thus, Plaintiff could not have gained a legally cognizable expectation of permanence since she only worked for approximately two (2) years under this appointment.[7] The Court finds that the requirement of justification pursuant to Article 46, Sec. 46.6 fails to reach the threshold of a property interest.

The Court, however, finds that Plaintiff's same argument was rejected by the First Circuit Court of Appeals in *Lovelace v. Southeastern Massachusetts University*, 793 F.2d 419 (1st Cir.1986). In *Lovelace*, 793 F.2d 419, the teaching contract of a non-tenured university professor was not renewed. Lovelace sued the university claiming that he was deprived of due process when his contract was not renewed without first affording him a pre non-renewal hearing. Lovelace claimed that even though he was not tenured, the rules of the university required just cause before deciding not to renew the contract. The Court reasoned that the just cause requirement failed to reach the threshold of a property interest. The continuous renewal merely served to facilitate the president of the teaching institution to exercise his judgment in reaching a decision by ensuring that he would have written opinions of relevant different persons in the university hierarchy before him when he was ready to act. *Lovelace*, 793 F.2d at 422.

Plaintiff is in a similar situation as she was holding a probationary contract, and Article 46, Sec. 46.4 of the Rules and Regulations of the University indicate that the Chancellor, as stated *infra*, can terminate the appointment "when so justified". **(Docket # 164, Rules and Regulations of the University, Article 46, Sec. 46.6, cited above p. 24)**. The Court finds that the requirement of justification and/or just cause is not tantamount to a property interest, it is evident that Plaintiff had no constitutional due process right to a pretermination hearing, since her appointment was probationary. *Lovelace*, 793 F.2d at 422; *Colón v. Municipio de Ceiba*, 112 D.P.R. 740, 745–746 (1982), 12 P.R. Offic. Trans. 932.

The Court notes that Plaintiff also argues that a property interest in her appointment was created because the probationary appointment contract did not have a specific expiration date. **(Docket # 164, Exhibit 7)**. However, the Court again is not persuaded by this argument because Article 46, Section 46.2, of the Rules and Regulations of the University clearly state that an individual cannot obtain tenure without first undergoing a probationary period of at least five (5) years. **(Docket # 164, Exhibit 4, Article 46, Sec. 46.2, cited above in p. 24)**. Thus, even though

---

ble inferences or unsupported speculation." *Ayala–Gerena v. Bristol Myers–Squibb Co.*, 95 F.3d 86, 95 (1st Cir.1996). *Caroline DeLia v. Verizon Communications, Inc.*, 656 F.3d 1 (1st Cir.2011); *Crespo v. Schering–Plough Del Caribe, Inc.*, 354 F.3d 34, 45 (1st.Cir.2003).

7. Article 46, Sec. 46.6 indeed states, however, that the employer will justify, "when so justified," its determination to terminate the probationary period by notifying the affected person in writing. *See* discussion as to the valid non discriminatory reasons to terminate Alberti found in the analysis under Plaintiff's Title VII Claim *infra*.

her probationary contract was for an indefinite period of time, but not more that five (5) years, she still had to fulfill the minimum time requirements established by Article 46, Section 46.2 of the Rules and Regulations prior to acquiring a cognizable property interest.

The Court, thus, cannot conclude that a probationary contract that does not contain an expiration date, but cannot be more than five (5) years in probation under the General Regulations of the University of Puerto Rico, automatically creates a property interest, because such a conclusion would be in contravention of the Rules and Regulations of the University. In *Kauffman v. Puerto Rico Telephone Company*, 841 F.2d 1169 (1988), the First Circuit Court of Appeals held "that any property right associated with a career position is rendered null and void if a violation of the Personnel Act attends the filling of such a position." *Id.* at 1173. In reaching this conclusion the Court carefully analyzed Puerto Rico Supreme Court jurisprudence, specifically *Colón v. Mayor of Municipality of Ceiba*, 112 D.P.R. 740 (1982), 12 P.R. Offic. Trans. 932. *Colón* stands for the proposition that when an employee is "freely selected he [she] could also be freely removed, sec. 5.10 of the Personnel Act, 3 L.P.R.A. § 1350." 112 D.P.R. at 746, 12 P.R. Offic. Trans. 932, p. 4. "The protection of the career position cannot be extended to he [she] who obtained the position on the basis of standards foreign to that category." *Colón, supra.* "Equal protection of the law does not imply equal protection to violate the law. . . ." *Colón, supra,* citing *Del Rey v. J.A.C.L.*, 107 D.P.R. 348, 355 (1978), 7 P.R. Offic. Trans. 383.

In *Colón, supra,* an individual was hired by the Municipality of Ceiba as a trust employee. However, his functions were not those of a trust employee as defined by state law. When he was terminated he claimed that even though his contract stated that he was a trust employee, since his functions were those of a career employee, he could not be terminated without first having charges raised against him and undergoing a pre-termination hearing as required by state law. The Supreme Court of Puerto Rico concluded that his functions were those of a career employee. However, the Court determined that even though his functions were those of a career employee, he did not have the rights afforded to a career employee because before acquiring such rights, the law required that the individual compete against other eligible candidates; take a classification exam, and successfully approve **the legally required probationary period.** Since, like in the case of Alberti, the individual in *Colón v. Municipality of Ceiba*, did not comply with the aforementioned legal requirements, the Court concluded that he did not possess a property interest in his position. *Id.* at 745. The same conclusion was also reached by the First Circuit Court of Appeals in *Kauffman.* *Kauffman*, 841 F.2d at 1176.

The Court concludes that Plaintiff has not established that she reached the required state level of a property interest in any of the two positions at the University. On the contrary, the Rules and Regulations of the UPR, as cited above, clearly demonstrate that she did not enjoy a property interest in either of the two jobs.

Even though the Court's finding turns moot the question of whether or not the individual Defendants are entitled to the qualified immunity defense as to damages, the Court explains that notwithstanding, all individual Defendants are entitled to qualified immunity.

## C. Qualified Immunity.

Qualified Immunity is an affirmative defense against damages liability, which may be raised by state officials sued

in their personal capacity. *Gómez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). This defense "shields federal and state officials from money damages unless a plaintiff pleads facts showing: (1) that the official violated a statutory or constitutional right; and (2) that the right was "clearly established" at the time of the challenged conduct." *Ashcroft v. al–Kidd,* —— U.S. ——, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011); *Pearson v. Callahan,* 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009); *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *San Gerónimo Caribe Project v. Acevedo–Vilá,* 650 F.3d 826 (1st Cir. (Puerto Rico)(2011)). The Supreme Court has also held that the Courts have discretion to decide which of the referenced "two-prongs of qualified immunity analysis to tackle first." *Pearson,* 555 U.S. at 236, 129 S.Ct. 808.

The doctrine of qualified immunity serves critical important purposes. In the absence of a broad and protective immunity shield, the threat of personal liability would create a costly "diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Harlow,* 457 U.S. at 814, 102 S.Ct. 2727. The "fear of being sued" would also "dampen the ardor of all but the most resolute ... [public officials] in the unflinching discharge of their duties." *Id.,* (citation omitted). Moreover, the doctrine recognized the unfairness of holding public officials liable for conduct as to which the law was uncertain or undeveloped at the time of their actions. *Crawford–El v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998).

Under the standard of objective reasonableness formulated in *Harlow,* officials "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established law of which a reasonable person would have known."

*Harlow,* 457 U.S. at 818, 102 S.Ct. 2727. To overcome this barrier, it is not enough for the plaintiff to assert an abstract right. "[T]he focus must be upon the particular conduct engaged in by (or attributed to) the defendants; immunity is forfeited only if a reasonable official would clearly understand that conduct to be a violation of the Constitution." *Rivera–Ramos v. Roman,* 156 F.3d 276, 280 (1st Cir.1998). As the qualified immunity defense has evolved, the Supreme Court stated that "it provides ample protection to all but the plainly incompetent." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

In the instant case the individual Co–Defendants are entitled to the qualified immunity defense because: (1) Plaintiff did not demonstrate that the officials violated a statutory or constitutional right; and (2) at the time Plaintiff was terminated it was not clear that she had a property right. *Ashcroft,* 131 S.Ct. at 2080.

Regarding Plaintiff's appointment as FNP Program Director, the Rules and Regulations of the UPR state that directorial appointments are of trust, and can be terminated at the will of the Chancellor. Further, any faculty member who also has administrative functions cannot attain permanence in those administrative functions. Further, the evidence shows that Alberti intervened in the formulation of academic policy. **(Docket # 164, Exhibit 4, Rules and Regulations of the University, Article 66, Sec. 66.2.1 and Article 71, Sec. 71.3.1.2, cited above in p. 17 and 18; and SUMF # 63)**. In view of the foregoing this Court finds that Plaintiff has not been able to demonstrate that at the time of her removal it was clearly established that she possessed a property right as FNP Program Director. Much less that the individual Co-defendants, violated a clearly established law of which a reasonable person would have known.

Similarly, in regard to Plaintiff's probationary appointment, the law and/or the Rules and Regulations are clear that in order to gain permanence and/or tenure in such position, one has to successfully comply with the five (5) year minimum regulatory requirement. (**Docket # 164, Exhibit 4, Rules and Regulations of the University of Puerto Rico, Article 30, Sec. 30.1.1, 30.1.2, and 30.1.8; Article 46.2, Sec. 46.2**). Since Plaintiff only worked for approximately two (2) years, then it follows that a property right was not clearly established at the time of her termination.[8] (**Docket # 164, SUMF # 12 and # 70**).

After considering the uncontested material facts, it is clear that the individual Co–Defendants should not be subjected to the risk of personal liability, or to the cost and inconvenience of a trial. Even if Plaintiff could prove all of the allegations in the *Third Amended Complaint* (**Docket # 123**), Defendants' alleged conduct did not violate "clearly established" law, and no reasonable public official would have believed that such conduct would violate Plaintiff's rights. Further and most critical, even on the merits she never fulfilled the requirements of the Regulations to earn a property right which constitutes the sine qua non to activate the constitutional due process claims.

Therefore, Plaintiff's claim that she was deprived of her property without due process of the law in violation of the Fourth, Fifth and Fourteenth Amendment of the United States Constitution claimed under 42 U.S.C. § 1983 and § 1985, is hereby **DISMISSED WITH PREJUDICE.**

## IV. First Amendment

Plaintiff claims that her removal and termination were executed by the individual Defendants in violation of the First Amendment of United States Constitution because allegedly it was performed in retaliation for engaging in protected speech as to matters of public concern[9]. The expressions that Plaintiff claims are protected by the First Amendment are: (1)accusing a student, Co–Defendant Iris Ramos of violating the HIPAA (42 U.S.C. § 1320d–2); (2) requesting the University to take disciplinary action against said student; (3) refusing to provide an academic grade to Iris Ramos' research proposal in another class, as Plaintiff was accusing the student for violation of HIPPA law; and (4) writing a letter to her superior, Carlo, complaining about internal issues as to the Nursing FNP Program. Plaintiff avers that these expressions constituted protected free speech regarding a matter of public concern[10]. (**Docket # 164, SUMF # 49–52**)

---

8. The Supreme Court of Puerto Rico in *Cassasús v. Escambron Beach Hotel*, 86 P.R.R. 356, 360 (1962), in cases of employees hired with an indefinite period of time subject to a probationary contract, that a termination within which his/services may be dispensed with [the probationary period] [is] "without his having a right of action." The Court emphasized that "[n]ot until th[e] permanency [was] obtained, the appellee could discharge him within the probationary period without obligation to pay him the compensation for the discharge fixed by law." *Id.* at p.p. 361–362.

9. This claim specifically *excludes Co–Defendant the University.* (**Docket # 123, Third**

*Amended Complaint* p. 4, ¶ 2, and p.p. 36–37, ¶ 124–128).

10. In the *Third Amended Complaint* Plaintiff makes claims that she wrote a letter to the Health Resource and Services Administration (HRSA) complaining about an alleged misuse of grant funds. (**Docket # 123, Third Amended Complaint, p. 4, ¶ 2**) However, there is no evidence in the record to support her allegation. *Morales*, 246 F.3d at 33–35. The record only shows that on December 4, 2007, she wrote an official letter as Program Director to the then Chancellor, Carlo, raising several complaints about other members of the administration of the FNP program, and a stu-

**472**

■ The Supreme Court of the United States recognized that public employees do not surrender all their First Amendment rights by reason of their employment. Thus, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern. *Pickering v. Board of Ed. of Township High School Dist. 205, Will County,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *see also Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

■ To establish an actionable claim of unconstitutional retaliation in a public employee's speech case, Alberti must meet three requirements. Plaintiff must first demonstrate that she was speaking as a citizen on a matter of public concern. If Alberti did not speak as a private citizen, then she has no First Amendment cause of action based on the government employer's reaction to the speech. *Garcetti v. Ceballos,* 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006); *Díaz–Bigio v. Jorge Santini,* 652 F.3d 45, 51–52 (1st Cir. (Puerto Rico) 2011) (Lynch, J.). Second, the Plaintiff must show that her interest in the speech outweighs the government's interest as an employer in avoiding disruption in the workplace. *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731. Third, Alberti must produce sufficient direct or circumstantial evidence from which a jury reasonably may infer that a constitutionally protected conduct was the substantial or motivating factor behind the adverse employment action. *Díaz–Bigio,* 652 F.3d at 51–52; *Acevedo–Díaz v. Aponte,* 1 F.3d 62, 67 (1st Cir.1993). Moreover, even if Plaintiff were to succeed in establishing said causal relationship, the "employer can still defeat the claim 'by proving by a preponderance of the evidence that the governmental agency would have taken the same action against the employee "even in the absence of the

protected conduct." ' " *Díaz–Bigio,* 652 F.3d at 52, quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

The First Circuit recently held that " 'the "but for" causation test' and 'the defendant-employer's *"Mt. Healthy* defense" '___'ensure [ ] that a plaintiff-employee who would have been dismissed in any event on legitimate grounds is not placed in a better position merely by virtue of the exercise of a constitutional right irrelevant to the adverse employment action.' " *Díaz–Bigio,* 652 F.3d at 51, citing *Acevedo–Díaz,* 1 F.3d at 66, and *Mt. Healthy,* 429 U.S. at 285, 97 S.Ct. 568.

Without a significant degree of control over its employee's words and actions, a government employer would have little chance to provide public service efficiency. *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731; *Garcetti,* 547 U.S. at 418, 126 S.Ct. 1951. When citizens enter government service, the citizens by necessity must accept certain limitations of their freedom. *Waters v. Churchill,* 511 U.S. 661, 671, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations. Thus, "while the First Amendment invests public employees with certain rights, it does not empower them to constitutionalize the employee grievance". *Connick v. Myers,* 461 U.S. 138, 154, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

The Supreme Court in the case of *Garcetti v. Ceballos,* 547 U.S. 410, 126 S.Ct. 1951, made particularly pertinent the identifying whether Alberti has an actionable First Amendment claim. In *Garcetti, supra,* the plaintiff also raised a First

dent. **(Docket # 164 and Docket # 179, Ex-** hibits **# 49 and # 50).**

Amendment claim because the employer, a government entity, took an adverse employment action in retaliation for plaintiff's speech. The Court held that when *public employees articulate statements pursuant to their official duties, they are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.* (Emphasis ours). *Garcetti,* 547 U.S. at 421, 126 S.Ct. 1951.

■ After analyzing the expressions made by Alberti, the Court concludes that the statements by Alberti were made pursuant to her duties as a University employee. First, Plaintiff clearly did not speak as a private citizen when she informed her superior, Carlo, that there were certain problems with the Program she directed. Second, Plaintiff did not speak as a citizen when she accused one of her students, Co–Defendant Ms. Iris Ramos of allegedly violating HIPPA Regulations. Third, Plaintiff was not acting as a citizen when she refused to sign Co–Defendant Ms. Iris Ramos' research proposal as alleged retaliation for allegedly violating HIPPA in another class.

All of the prongs of the *Díaz–Bigio's* test are met and supported by Plaintiff's letter of December 4, 2007 to Carlo. The Court finds that the December 4, 2007 letter was signed by Plaintiff as "FNP Program Director," Alberti's official capacity. (**Docket # 164, Exhibit 25**). The heading of the letter also shows it is an official document—"University of Puerto Rico, Medical Science Campus, School of Nursing, FNP Program." Moreover, the letter pertains to issues regarding the ad-

ministration of the FNP Program. As Director, Plaintiff was paid to, *inter alia,* assume the general direction of all the administrative and academic work of the FNP Program, and ensure that the funds were used according to the grant's terms and conditions. (**Docket # 164, SUMF # 15 and # 16**).

It is pellucidly clear to the Court that Plaintiff acted as a government employee and not as a private citizen as [or], *"Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of the employer's control over what the employer itself has commissioned or created"*. (Emphasis ours). *Garcetti,* 547 U.S. at 421–422, 126 S.Ct. 1951.

As in *Garcetti,* should Plaintiff's superiors in their discretion determine that her accusations and/or speech related actions were inflammatory or misguided, they had the authority to take corrective action[11]. 547 U.S. at 423, 126 S.Ct. 1951. The Supreme Court specifically rejected "**the notion that the First Amendment shields from discipline the expressions employees make pursuant to their professional duties.**" *Id.* (Emphasis ours). "Our precedents do not support the existence of a constitutional cause of action behind every statement a public employee makes in the course of doing his or her job." *Id.* at 426, 126 S.Ct. 1951. Accordingly, the Court also rejects the notion that Plaintiff's expressions, made pursuant to her profes-

---

11. The Court notes that Carlo testified under oath in his deposition that he did not terminate Plaintiff as a result of her expressions. He testified that he terminated Alberti for legitimate reasons related to Plaintiff's performance as an administrator and as a professor. (**Docket # 164, Exhibit # 3, Transcript of Dr. Carlo's Deposition, p. 168 L 18–19 and** p. 170, L 14–25). Moreover, the evidence on the record clearly supports Carlo's testimony given that there is extensive admissible and uncontested documentary evidence that reflect Plaintiff's extensive performance problems. (**Docket # 164, SUMF # 21–55, 59 and 64–70**).

sional duties, are protected by the First Amendment.

Moreover, even though the Court determined that Plaintiff was not speaking as a citizen for First Amendment purposes, a conclusion which disposes of the matter, the Court also doubts that the actual expressions at issue regarded matters of public concern. To determine whether speech is of public or private concern the Court must independently examine the "content form, and context of the speech as revealed by the whole record. In considering content form, and context, no factor is dispositive, and it is necessary to evaluate all aspects of speech." *Snyder v. Phelps*, —— U.S. ——, 131 S.Ct. 1207, 1211, 179 L.Ed.2d 172 (2011).

In the case at bar, the "content" of the expression were issues directly related to Plaintiff's functions as FNP Program Director and Associate Professor; to wit: issues with the administration of the FNP Program, and the grading of student Co-Defendant Iris Ramos. **(Docket # 164, SUMF # 49–52).**

In the analysis of the "context" of the speech, the record shows that her expressions were via official letters sent to her superior, the then Chancellor Carlo. The Court finds that based on content and context of the speech as shown by the record, the same does not reflect matters of public concern. Consequently, Plaintiff failed to demonstrate that she was speaking as a citizen about matter of public concern. *Garcetti*, 547 U.S. at 418, 126 S.Ct. 1951; *Díaz–Bigio*, 652 F.3d at 51–52, citing *Acevedo–Díaz*, 1 F.3d at 67.

Even though this finding disposes of Plaintiff's First Amendment cause of action, the Court also notes that Plaintiff failed to meet the other two (2) requirements in a First Amendment claim as established in *Díaz–Bigio v. Jorge Santini*, 652 F.3d 45. Specifically, Plaintiff failed to demonstrate that her interest in the speech outweighs the government's interest as an employer in avoiding disruption in the workplace. The record is devoid of any evidence to support such a finding.

Further, Plaintiff also failed to demonstrate that constitutionally protected speech was the substantial or motivating factor behind the adverse employment action. The uncontested material facts clearly demonstrate that the University had ample legitimate justifications to remove Alberti from the trust position as FNP Program Director, as well as Plaintiff's probationary appointment as Associate Professor. The Court finds that Plaintiff has proffered no evidence to show that her speech was the motivating factor behind the adverse employment action, consequently Plaintiff's First Amendment claim fails in this regard as well. *Díaz–Bigio*, 652 F.3d at 51–52.

Moreover, even though Plaintiff did not present any evidence to support an allegation of "academic freedom", since this case takes place within the purview of administrative matters of the University as opposed to academic freedom expressions, the Court finds it prudent to briefly discuss the Supreme Court's statement in *Garcetti* that in a case involving academic freedom, there could be additional constitutional interest that might have to be considered. 547 U.S. at 425, 126 S.Ct. 1951.

When addressing academic freedom, the Court has recurrently described said protected matter in terms of the liberty of open classroom discussion and inquiry of who, what and how it shall be taught. *Sweezy v. New Hampshire*, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957). Academic freedom is a special concern of the First Amendment, which "does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Board of Regents of the University of the State of*

*New York*, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) "To the extent that the Constitution recognizes any right of "academic freedom" above and beyond the First Amendment rights to which every citizen is entitled, the right inheres in the University, not in individual professors." *Johnson–Kurek v. Abu–Absi*, 423 F.3d 590, 593 (6th Cir.2005).

The case of *Lovelace*, 793 F.2d 419, again offers substantial guidance in disposing of this matter. As in the present case, Lovelace alleged that the real reason his teaching contract was not renewed was because he refused to inflate his grades or lower his academic expectations and teaching standards. He also contended that in response to student complaints that homework assignment were too time consuming and that his courses were excessively hard, the University first threatened not to renew his contract unless he appeased the students, and then carried out the threat when he refused to lower his standards. Plaintiff claimed that those actions by the University interfered with his academic freedom and violated his First Amendment rights. *Lovelace*, 793 F.2d at 425.

The First Circuit rejected Lovelace's argument stating that "to accept plaintiff's contention that an untenured teacher's grading policy is constitutionally protected and insulates him from discharge when his standards conflict with those of the university would be to constrict the university in defining and performing its educational mission." *Lovelace*, 793 F.2d at 426. ***"The First Amendment does not require that each non-tenured professor be made a sovereign unto himself."*** (Citations omitted) (Emphasis ours), *Id.*; *Palmer v. Board of Education*, 603 F.2d 1271 (7th Cir.1979) (First Amendment rights of probationary teacher were not infringed by discharging her for refusing to teach patriotic subjects; a public school teacher is not free to disregard the prescribed curriculum concerning patriotic matter); *see also Clark v. Holmes*, 474 F.2d 928, 931 (7th Cir.1972) (a university teacher does not have a First Amendment right to disregard established curriculum content); *Hetrick v. Martin*, 480 F.2d 705 (6th Cir. 1973); *Johnson–Kurek v. Abu–Absi*, 423 F.3d at 594. ***"First Amendment does not prevent a university from terminating untenured teacher whose pedagogical style and philosophy did not conform with those of the school's administration."*** *Lovelace*, 793 F.2d at 426, citing *Hetrick v. Martin*, 480 F.2d 705. (Emphasis ours).

The record shows that the expressions that Alberti alleges were protected by the First Amendment were not related to academic freedom. To the contrary, the expressions at issue were directly related to Alberti's duties and responsibilities as Director of the FNP. Consequently the concerns raised by the Supreme Court in *Garcetti*, 547 U.S. 410, 126 S.Ct. 1951, are not applicable to the instant case.

The Court reiterates the standard as to qualified immunity, *see infra*, and notes that Plaintiff's First Amendment claim is only raised against the officials of the University in their individual capacity. Consequently, the Court finds it prudent to explain why it finds that these individuals are protected by qualified immunity.

The Supreme Court held in *Garcetti*, 547 U.S. 410, 126 S.Ct. 1951 that restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. *Id.* at 421–422, 126 S.Ct. 1951. Thus, it follows that the individual Defendants could have reasonably believed that those expressions were not protected because they were made in the University regarding internal administrative issues of the FNP Program.

Further, "even when the general rules has long been clearly established (for instance, the First Amendment bars retaliation for protected speech)," the official enjoys immunity if there is "doubt as to the illegality of the defendant's particular conduct (for instance whether a plaintiff's speech was on a matter of public concern)". *Crawford–El v. Britton,* 523 U.S. 574, 593, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). Thus, even if the Court determined that Plaintiff's speech was protected, it was not reasonable for Defendants to prognosticate that their actions were prohibited. Consequently, it was not clear at the time of the acts at issue that Defendants' actions were prohibited; hence qualified immunity protects Defendants from damages in the case at bar.

Moreover, after the precedent set forth and made public by the Supreme Court in *Garcetti,* 547 U.S. 410, 126 S.Ct. 1951, it was not unreasonable for Defendants to have concluded that it was objectively reasonable for them to believe that their acts did not violate the Constitution. Particularly, because the alleged protected "expressions" made by Plaintiff were made during the employment, in Alberti's capacity as Program Director and/or as an non-tenured professor and furthermore were directly related to her employment responsibilities.

Based on the record the Court finds that in the instant case, as in *Garcetti,* 547 U.S. 410, 126 S.Ct. 1951, Plaintiff's alleged statements and actions were made pursuant to her official capacity as FNP Program Director, and Associate Professor. The Court further finds that Plaintiff did not demonstrate that her interest in the speech outweighed the government's interest as an employer in avoiding disruption in the workplace, and did not show that her expressions were a substantial and/or motivating factor behind the adverse employment actions, as the employer has articulated valid non discriminatory reasons for terminating Alberti. Hence, Plaintiff has failed to comply with the evidentiary requirements set forth in *Díaz–Bigio,* 652 F.3d at 51–52. Consequently, it is evident that Plaintiff's alleged expressions are not protected by the First Amendment. Thus, Alberti's First Amendment claim is **DISMISSED WITH PREJUDICE.**

## V. Title VII Claim

In the case of caption, Plaintiff claims that she was mistreated, harassed, and terminated as FNP Program Director and Associate Professor because she was born and raised in the United States. (**Docket # 123, Third Amended Complaint p. 37–38**). Title VII makes it unlawful to discriminate against any individual, *inter alia,* due to their national origin. 42 U.S.C. § 2000e–2.[12]

Since Plaintiff has not produced any direct evidence of national origin discrimination, the Court will analyze Plaintiff's case under the three-part burden-shifting framework, also referred to as the *McDonnell Douglas* burden shifting model. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

 Under the *McDonnell Douglas* framework, the plaintiff shoulders the initial burden of adducing a prima facie case of unlawful discrimination. This includes a

---

**12.** Title VII and Law 100 claims *refer exclusively to the University, and specifically exclude the rest of the Co–Defendants.* (**Docket 123, Third Amended Complaint, p.p. 4–5, ¶ 3, and 9, and p.p. 37–38, ¶¶ 129–137**) 37–38,

¶¶ 129–137). There is no liability as to individual employee defendants under Title VII. *Fantini v. Salem State College,* 557 F.3d 22, 30–31 (1st Cir.2009).

showing that: · (1) plaintiff is a member of the protected class; (2) plaintiff's employer took an adverse employment action against her; (3) plaintiff was qualified for the employment she held; (4) plaintiff's position remained open or was filled by a person whose qualifications were similar to his. *Rodríguez–Cuervos v. Wal–Mart Stores, Inc.,* 181 F.3d 15, 19 (1st Cir.1999). Establishing a prima facie case of discrimination creates a rebuttable presumption of unlawful discrimination. *St. Mary's Honor Center,* 509 U.S. at 506, 113 S.Ct. 2742; *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). However, Plaintiff must carry the burden throughout the entire *McDonnell Douglas* burden shifting procedure. *Rodríguez–Cuervos,* 181 F.3d at 19, n. 1; *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

█ The uncontested material facts in this case demonstrate that Plaintiff meets the prima facie initial burden. Plaintiff: (1) is a member of the protected class, she was born in the United States (**Docket # 164, Exhibit 2 and; Docket # 179, Exhibit 2**) [13]; (2) suffered an adverse employment action by being removed from the position of FNP Program Director and terminated from the probationary position of Associate Professor (**Docket # 164, Exhibit 59**); (3) was qualified for the employment she held (**Docket # 164, Exhibit 1 and Docket # 179, Exhibit 1**); and (4) was replaced by a person whose qualifications were similar to hers, Dr. Carmen López [14]. (**Docket # 164, Exhibits 56 and 59**).

█ Once the Plaintiff satisfies her burden, the employer must articulate ˙a legitimate, nondiscriminatory reason for its employment decision. However, the required burden is one of production and not of persuasion. Should the employer provide such reason, the burden shifts back to the plaintiff to proffer evidence that the articulated reason was a sham, and that she suffered the adverse employment action due to her national origin. *St. Mary's Honor Center,* 509 U.S. at 508, 113 S.Ct. 2742; *Rodríguez–Cuervos,* 181 F.3d at 19 (the plaintiff must prove a "sham" reason produced by the employer, and that the employer "true reason was plaintiff's ... national origin").

Defendants articulated that Plaintiff was terminated because, *inter alia,* she did not attend faculty meetings; was not complying with her administrative duties as a professor by refusing to present the weekly "Work Plan"; refused to sign the "Teletrabajo" contract; created a divisive environment in her classes, resulting in multiple student complaints; inappropriately refused to sign the research investigation of a student; accused a student of violating the HIPPA law without first following the proper channels instituted by SON; insulted students in officially addressed e-mails; harassed students; refused to meet with the administration in order to assist in problems that the FNP Program encountered while Plaintiff acted as the Program Director; refused to meet with certain administrative members, including her supervisor, merely indicating that Plaintiff did not trust them; failed to follow the proper institutional procedure in the process of evaluating her course; failed to program the clinical rotations of assigned students, and to assign their pre-

---

13. The Court notes that Plaintiff testified she considers herself Puerto Rican and Puerto Rican American. Also, Plaintiff's family from her mother's side is from Ponce, Puerto Rico. (**Docket # 164, Exhibit 2**).

14. The Court notes that the record only shows that Alberti was replaced by Dr. Carmen López in the position of FNP Program Director. There is no evidence in the record that shows that Plaintiff was also replaced in the probationary position as Associate Professor.

ceptors; failed to register her courses following institutional procedures correctly; and, finally did not follow established institutional procedure in requesting academic grades changes. (**Docket # 164, Exhibits 21–55, 59, 64, 65, 66, 67, 68, 69 and 70**).

■ The Court finds that the explanations articulated by Defendants constitute legitimate non-discriminatory reasons for the adverse employment actions. The burden then shifts pursuant to the *McDonnell Douglas* procedure back to Alberti, who is required to demonstrate that the employer's reasons were but mere pretexts for national origin discrimination. *Rodríguez–Cuervos*, 181 F.3d at 19. To meet this burden, the Plaintiff must prove not only that the reasons articulated by the employer were a sham, but also that its "true reason behind the adverse action was plaintiff's ... national origin." *Id.* at 19. Expressed in alternate fashion, in the case at bar, Alberti cannot advert summary judgment if the record is devoid of adequate direct or circumstantial evidence of showing pretext or a sham together with a showing of an action taken by the employer was motivated by national origin discrimination.

After carefully reviewing the record the Court finds that the same is devoid of any evidence which contradicts the University's reasons behind removing Alberti from the FNP Program Director position and terminating her probationary appointment as an Associate Professor. Nowhere in Alberti's Opposing Statement of Facts (**Docket # 179**), is there any supporting evidence presented by Plaintiff which may create a controversy of fact as to the non-reasons produced by the University to justify the referenced adverse employment actions. Plaintiff's evidence consists of blanket denials, speculation and conclusory allegations which are insufficient to defeat summary judgment. *Gutiérrez–Lines*, 751 F.Supp.2d at 334. Plaintiff falls short of providing not only the reason articulated by the employer was a "sham" or a pretext for discrimination, but also that its true reason was Plaintiff's national origin. *Rodríguez–Cuervos*, 181 F.3d at 19, citing *Shorette v. Rite Aid*, 155 F.3d 8, 12 (1st Cir.1998).

The record has extensive documentary and testimonial evidence in support of the reasons provided by the UPR to terminate Alberti. **Docket # 164, Exhibits 15, 17, 23, 24, 30, 36 and 38.** The record reflects that Plaintiff was removed because of performance issues and terminated due to performance differences related to both her administrative duties as FNP Program Director, as well as her teaching deficiencies as an Associate probationary Professor. Since Plaintiff did not fulfill the requirement of refuting the reasons, provided by the University constituted "a sham" and also that the UPR's true reason was Plaintiff's national origin, the Court concludes that Plaintiff failed to meet her ultimate burden, under *McDonnell Douglas* that she was a victim of national origin discrimination. *Rodríguez–Cuervos*, 181 F.3d at 19.

The record reflects that Plaintiff's evidence of discrimination consists of stray remarks and conduct unrelated to the protected status under Title VII. According to her, the UPR discriminated against her because two students, Co-defendants Judyth Miranda and Iris Ramos, as well as a member of the administration Co-defendant Angélica Matos, the then Director of the Department of Graduate Studies of the SON,[15] on certain occasions referred to her as "Americana" and "gringa". (**Docket # 179, Exhibit 25; and Docket # 163, p.p. 28–37**).

---

**15.** The Court notes that the record reflects that both Miranda and Matos were born in the continental United States. (**Docket # 164, Exhibits 32 and 82**).

Regarding the alleged discriminatory statements, the Court is mindful that most of the remarks were uttered by students thus, significantly diminishing their probative value in this case. Moreover, these comments constitute mere "stray remarks" incapable of acting as "direct evidence" or to prove pretext in the context of the burden shifting framework.

■ It is hornbook law in the First Circuit that "stray remarks" do not demonstrate discriminatory animus, especially if the remark was uttered by a non-decision maker. *Santiago v. Canon USA, Inc.*, 138 F.3d 1, 6, n. 8 (1st Cir.1998); *Deneen v. Northwest Airlines, Inc.*, 132 F.3d 431 (8th Cir.1998) (citing *Geier v. Medtronic, Inc.*, 99 F.3d 238, 241 (7th Cir. 1996)); *Valtchev v. The City of New York*, 2009 WL 2850689 (S.D.N.Y.2009). (In a discrimination claim under national origin, a professor born in Eastern Europe claimed that students painted a negative picture of him by calling him "Russian spy" and "KGB man," wherein the Court ultimately considered said stray-remarks short of showing the threshold of national origin discrimination).

The First Circuit has reiterated and consistently rejected the probative value of stray remarks. "To be probative of discrimination, isolated comments must be contemporaneous with the discharge or casually related to the discharge decision making process." *Deneen v. Northwest*

*Airlines, Inc.*, 132 F.3d 431 (8th Cir.1998) (citing *Geier v. Medtronic, Inc.*, 99 F.3d 238, 241 (7th Cir.1996)); see also *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438–1439 (9th Cir.1990) (holding that certain statements unconnected to the employment decision-making process are simply stray remarks that do not demonstrate discriminatory intent).

Moreover, the Court is convinced that in the context of this case, to call a person in Puerto Rico, who was born in the continental United States "Americana" and "gringa," falls short of constituting evidence of discrimination. Reference to protected status without reflecting bias is not evidence of discrimination. *Elam v. Regions Financial Corp.*, 601 F.3d 873, 878 (8th Cir.2010) (a supervisor calling a pregnant employee "pregnant" and "pregnant teller" fails to be evidence of discrimination since it is a mere reference to her protected status).

Further, Plaintiff also alleges that during a meeting ("conversatorio") between the administration and the FNP students, certain students were complaining about Alberti, while others were defending her. Alberti alleges that on one occasion, the then Dean of the SON, Sánchez allegedly raised her voice and told a student who allegedly was supporting Alberti to shut up. (**Docket # 179, Exhibit 25**). After the meeting, a student claims that she saw Sánchez pointing at Alberti and telling her that there were many complaints against her[16]. (**Docket # 179, Exhibit 81**).

---

16. Alberti also contends that during the first time she worked for the University in the years 2001 and 2002, certain members of the administration allegedly made fun of her Spanish and called her "gringa". Further, Alberti alleged that during that time, a fellow teacher criticized the United States in the wake of 9/11. However, the Court will not consider these alleged incidents because they are not contemporaneous to the date of the adverse action. *See Alvarado–Santos v. Dept. of Health of the Commonwealth of Puerto Rico*, 619 F.3d 126 (1st Cir.2010); *Domín-*

*guez–Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424 (1st Cir.2000). Further, an individual who intends to present an action under Title VII must file a charge within three hundred (300) days after the alleged discriminatory act occurred. *Fontánez–Nuñez v. Janssen Ortho LLC*, 447 F.3d 50, 55 (1st Cir.2006). (**Docket # 163, p. 28–35**). Hence, "if the incident on which the alleged violations are based occurred more than three hundred (300) days prior to the filing of the charge at the administrative agency, the claim is time-barred." *Castro Alvarez v. Delta Airlines, Inc.*, 319

As to this proffer, the Court concludes that even though telling a student by a decision maker as to Alberti to shut-up and pointing a finger at a person may be objectionable conduct, these incidents do not reflect a discriminatory animus behind the decision to terminate Plaintiff. Further, the Court cannot overlook the fact that Sánchez was the person who recommended Alberti's recruitment during Plaintiff's second term at the University. Further, the Court notes that Plaintiff admitted that Sánchez never insulted Alberti, and that Alberti never witnessed Sánchez harassing any person who supported Plaintiff. (Docket # 164, Exhibits 80 and 81). Since the above stated proffer constitutes all the evidence of discrimination in an attempt to offset the legitimate non-discriminatory reasons provided by the University, the Court must conclude that Plaintiff failed to meet her burden of demonstrating that the cause of her termination was "a sham" and that the "true reason" was her national origin. *Rodriguez–Cuervos*, 181 F.3d at 19.

For the aforementioned reasons the Court finds that Alberti failed to present sufficient evidence to establish that the reasons for her termination was pretext for discrimination. As a result, Plaintiff's Title VII claim is hereby **DISMISSED WITH PREJUDICE.**

### VI. 42 U.S.C. § 1985(3).

■ Plaintiff has brought forth claims of conspiracy under 42 U.S.C. § 1985[17]. To state a claim under 1985(3) Plaintiff must show the existence of: "(1) a conspiracy, (2) conspiratorial purposes to deprive a person or class of persons, directly or indirectly, of the equal protection of the laws or equal privileges and immunities under the law, (3) an overt act in furtherance of the conspiracy, and (4) either (a) an injury to person or property, or (b) a deprivation of a constitutionally protected right or privilege." *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir.1996). Thus, in order to prevail, a plaintiff must present "(1) some class based animus (usually racial) lay behind the conspirator's action, and (2) that the conspiracy was aimed at interfering with protected rights." *Burns v. State Police Ass'n of Mass.*, 230 F.3d 8, 12 (1st Cir.2000).[18]

---

F.Supp.2d 240, 246 (D.P.R.2004) (citing *Rivera Cordero v. Autonomous Municipality of Ponce*, 182 F.Supp.2d 221 (D.P.R.2002)).

If Plaintiff did not allege that the discrimination was one continuing action, any discrete acts of discrimination occurring outside the three hundred (300) days of the date that she filed her charge with the EEOC cannot be considered. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). In the case at bar, Plaintiff did not allege that the discrimination was one continuing action.

After considering this legal frame work, it is clear that Plaintiff is time barred from claiming that the alleged discriminatory events of her first term of employment with the University (2001 and 2002), constitute evidence of national origin discrimination for her removal as FNP Program Director and Associate Professor in 2008. Plaintiff had three hundred (300) days after the last incident occurred, but she took approximately seven (7) years to file the charge with the EEOC. Thus, said allegations of discrimination are clearly time barred.

17. The statute in its most pertinent portion describes conspiracy as follows: "[I]f two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly, or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... whereby another is injured in his person or property, ... the party so injured or deprived may have an action for the recovery of damages ..." 42 U.S.C. § 1985(3).

18. The Supreme Court has found that the language requiring the intent to "deprive of equal protection or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the

This means that, *inter alia,* in order for Plaintiff to have an actionable claim under this section, she has to demonstrate that she was "deprived of a constitutionally protected right." However, the Court has already concluded that Plaintiff's constitutional rights have not been violated by the Defendants. This finding alone disposes of Plaintiff's conspiracy claim.

Moreover, Plaintiff also has the burden of demonstrating that a racial animus was the motivating factor behind the conspiracy. However, the record is devoid of any evidence which suggest that Defendants acts were motivated by Plaintiff's race. To the contrary, the only evidence of discrimination presented by Plaintiff is allegedly regarding her national origin, but not her race. Even assuming that national origin is within the confines of coverage as an actionable claim under § 1985(3) the Court has determined that the instant case does not reach the required threshold under the *McDonnell Douglas* burden shifting requirements. The Court determined that there was no evidence to support a finding that Defendants actions were motivated by her national origin. Thus, the Court is forced to conclude that Plaintiff has failed to comply with the evidentiary burden for a 1985(3) claim. *Burns,* 230 F.3d at 12.

For the reasons set forth above, the Court finds that Alberti failed to present sufficient evidence to show that she possesses an actionable § 1985(3) claim. As a result, Plaintiff's § 1985(3) claim is hereby **DISMISSED WITH PREJUDICE.**

## VII. Cause of Action Under Puerto Rico Law

In addition to the aforementioned federal statutes, Plaintiff also seeks redress

pursuant to the local statutes Law 100 and Law 115.

▮ Plaintiff has failed to raise a single actionable federal claim. Consequently, the Court will abstain from considering, via supplemental jurisdiction, any and all local law claims raised in the Third Amended Complaint. "As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit, well before the commencement of trial, will trigger the dismissal without prejudice of any supplemental state-law claims". *Rodríguez v. Doral Mortgage Corp.,* 57 F.3d 1168, 1177 (1st Cir.1995).

▮ Further, the Court specifically dismisses with prejudice, any and all claims pursuant to Law 100, because Defendants, the University and the employees or agents of a nonprofit government instrumentality, are not under the scope of Law No.100. *Huertas–Gonzalez v. University of Puerto Rico,* 520 F.Supp.2d 304, 314 (2007). The legislative history of Law No.100 is clear that its main objective is to protect employees in the private industry from all types of discrimination. "[S]ince the U.P.R. is considered to be a non-profit government instrumentality, Law 100 does not apply in this case, against any of the Defendants," including the arms of the state and/or individual defendants working therein. *Huertas–González, supra,* at 314. Consequently, Dr. Alberti's cause of action under Law 100 is hereby **DISMISSED WITH PREJUDICE.**

## Conclusion

For the reasons set forth above, the Defendants' Motion for Summary Judgment, **Docket #161, is GRANTED.**

---

conspirators' action." *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); see also, *Kush v. Rutledge,* 460 U.S. 719, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983); *Santana v. Calderón,* 188 F.Supp.2d 160 (D.P.R.2002); *Vega Marrero v. Consorcio Dorado–Manati,* 552 F.Supp.2d 157, 164 (D.P.R.2007).

Plaintiff's First, Fourth and Fourteenth Amendments, 42 U.S.C. §§ 1983 and 1985, Title VII, as well as Law 100 claims, are **DISMISSED WITH PREJUDICE.** Plaintiff's Law 115 claim is **DISMISSED WITHOUT PREJUDICE.**

Judgment will be entered accordingly.

IT IS SO ORDERED.